The INDIANA CIVIL RIGHTS COMMISSION, and Thomas E. Gerardot and Walter J. Burton, Appellants (Respondents Below)

v.

SUTHERLAND LUMBER, Fort Wayne, Appellee (Petitioner Below).

No. 3–378A52.

Court of Appeals of Indiana, Third District.

Sept. 19, 1979.

Rehearing Denied Oct. 31, 1979.

---

5. 34–1–2–1 includes the six-year statute of limitations for implied contracts.

Theo. L. Sendak, Atty. Gen., Dennis K. McKinney, Deputy Atty. Gen., Indianapolis, for appellants.

N. Reed Silliman, Fort Wayne, Allan L. Bioff and Leonard Singer, Kansas City, Mo., for appellee.

STATON, Judge.

Thomas E. Gerardot and Walter J. Burton were employed by Sutherland Lumber, Fort Wayne, a retail lumber yard in Fort

Wayne, Indiana. When Gerardot and Burton failed to comply with certain uniform grooming standards, Sutherland terminated its employment of them. Gerardot and Burton filed separate complaints with the Indiana Civil Rights Commission (ICRC), each alleging that he was the victim of sex discrimination because of refusal to shave off his moustache as required by Sutherland's grooming standards. After a hearing on the consolidated complaints, the ICRC ordered Sutherland to reimburse Gerardot and Burton for lost wages; to offer reinstatement to Burton; and to revoke its policy forbidding employees from having moustaches or beards.

Sutherland appealed to a trial court, which reversed the order and set it aside. The trial court found the order to be arbitrary, capricious, not in accordance with the law, in excess of statutory authority and unsupported by substantial evidence.

We affirm.

Gerardot commenced working for Sutherland in the spring of 1972. Burton was hired by Sutherland in mid-1971. Sutherland required that all of its employees, regardless of their sex, maintain a neat and clean personal appearance in accordance with Sutherland's uniform grooming policy. The policy's prohibition against moustaches had been relaxed by the yard manager in Fort Wayne as long as moustaches were kept neat and trimmed. Subsequently, Sutherland determined that some employees were abusing the relaxed rule and reimposed the requirement that all employees be clean shaven. Gerardot refused to remove his moustache and was fired on September 25, 1972. Burton also refused to comply and his employment was terminated as of October 15, 1972. Other employees affected by the reimposition of the rule regarding facial hair complied with the company's grooming policy and remained employed.

## I.

### Standard of Review

The ICRC argues that its decision was supported by substantial evidence. When the ICRC renders a decision after a hearing, it is required [1] to include findings of fact on determinations material to its ultimate conclusions. To challenge the administrative decision,[2] a party appeals to a trial court, pursuant to the Indiana Administrative Adjudication Act [the Act], IC 1971, 4–22–1–1 et seq., Ind.Ann.Stat. § 63–3001 et seq. (Burns Code Ed.).

The Legislature set out the procedure under the Act to be followed by a trial court in its judicial review. 4–22–1–18 provides:

"On such judicial review, such court shall not try or determine said cause de novo, but the facts shall be considered and determined exclusively upon the record filed with said court pursuant to this act [4–22–1–1—4–22–1–30].

"On such judicial review, if the agency has complied with the procedural requirements of this act, and its finding, decision or determination is supported by substantial, reliable and probative evidence, such agency's finding, decision or determination shall not be set aside or disturbed.

"If such court finds such finding, decision or determination of such agency is:

"(1) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; or

"(2) Contrary to constitutional right, power, privilege or immunity; or

"(3) In excess of statutory jurisdiction, authority or limitations, or short of statutory right; or

"(4) Without observance of procedure required by law; or

"(5) Unsupported by substantial evidence,

the court may order the decision or determination of the agency set aside. The court may remand the case to the agency for further proceedings and may compel agency action unlawfully withheld or unreasonably delayed.

1. IC 1971, 22–9–1–6(k)(1) (Burns Supp. 1978).

2. IC 1971, 22–9–1–6(k)(2) (Burns Supp. 1978).

"Said court in affirming or setting aside the decision or determination of the agency shall enter its written findings of facts, which may be informal but which shall encompass the relevant facts shown by the record, and enter of record its written decision and order or judgment. [Acts 1947, ch. 365, § 18, p. 1451.]"

█ The Act does not attempt to define the meaning of substantial evidence—"a legal term which defies precise definition." *State Department of Natural Resources v. Lehman* (1978), Ind.App., 378 N.E.2d 31; *See* 4 K. Davis, *Administrative Law Treatise* § 29.01 (1958). To be upheld, an administrative determination must have a reasonably sound basis of evidentiary support. As Judge Robertson commented in *State Department of Natural Resources v. Lehman, supra,*

"This is not to suggest that *any* evidence supportive of an agency's determination requires a reviewing court's affirmance; . . ."

378 N.E.2d at 36.

We concluded in *City of Evansville v. Southern Indiana Gas and Electric Company* (1976), Ind.App., 339 N.E.2d 562, after a review of various authorities, that the substantial evidence standard authorizes a reviewing court to set aside a Commission's finding of fact when a review of the whole record clearly indicates that the agency's determination lacks a reasonably sound basis of evidentiary support.

The rationale necessitating a review of the whole record was summarized in *City of Evansville* as follows:

"Some additional clarification of our standard of review formula is necessary. It is well established that the substantial evidence test cannot be utilized to assay the 'reasonableness' of the conclusions of ultimate fact inferred by an agency from its findings of basic fact. *See, e. g., NLRB v. Babcock & Wilcox Co.* (1956), 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed.

975; *NLRB v. Truitt Mfg. Co.* (1956), 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027. Ultimate facts may be described generally as factual conclusions derived from the basic facts; they are often expressed in terms of statutory criteria such as 'fair value' or 'used and useful.' Since findings of ultimate fact represent inferences drawn by the agency, they are not susceptible to scrutiny for evidentiary support in the record, but the reasonableness of the agency's inference is a question appropriate for judicial determination—a 'question of law.'

"It is equally well settled that in determining the 'substantiality' of the evidence, the reviewing court must consider the evidence in opposition to the challenged finding of basic fact as well as the evidence which tends to support the finding. As Justice Frankfurter said: 'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' *Universal Camera Corp. v. NLRB* (1951), 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456."

*Id.* at 572, 573. *See Podgor v. Indiana University* (1978), Ind.App., 381 N.E.2d 1274; *L.S. Ayres & Company v. Indianapolis Power & Light Company* (1976), Ind. App., 351 N.E.2d 814.

The trial court in the case at bar, after a review of the entire record, found a basic fact not included in the ICRC's finding of fact:

"4. Burton and Gerardot could have remained employed by Sutherland if they had not failed and refused to shave their moustaches."

## II.

### Legislative Intent

The Indiana Civil Rights Law[3] [the Law] is codified at IC 1971, 22–9–1–1 to –12 (Burns Supp. 1978). The Law was amended in 1971[4] to include "sex" as a criterion which would not be tolerated as a discrimi-

---

3. When originally enacted in 1961 the act was titled "Fair Employment Practices." Acts 1963, ch. 173, § 1 substituted the words "Civil Rights" for "Fair Employment Practices."

4. Acts 1971, P.L. 357, § 1.

natory bar to access of civil rights. The purpose of the Law and public policy of the State are enumerated in 22–9–1–2:

"(a) It is the public policy of the state of Indiana to provide all of its citizens equal opportunity for education, employment, access to public conveniences and accommodations and acquisition through purchase or rental of real property including but not limited to housing, and to eliminate segregation or separation based solely on race, religion, color, sex, national origin or ancestry, since such segregation is an impediment to equal opportunity. Equal education and employment opportunities and equal access to and use of public accommodations and equal opportunity for acquisition of real property are hereby declared to be civil rights.

"(b) The practice of denying these rights to properly qualified persons by reason of the race, religion, color, sex, national origin or ancestry of such person is contrary to the principles of freedom and equality of opportunity and is a burden to the objectives of the public policy of this state and shall be considered as discriminatory practices. The promotion of equal opportunity without regard to race, religion, color, sex, national origin or ancestry through reasonable methods is the purpose of IC 1971, 22–9–1. . .

"(c) It is also the public policy of this state to protect employers, labor organizations, employment agencies, property owners, real estate brokers, builders and lending institutions from unfounded charges of discrimination.

"(d) It is hereby declared to be contrary to the public policy of the state of Indiana and an unlawful practice for any person, for profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, religion, color, sex, national origin or ancestry.

"(e) IC 1971, 22–9–1 . . . shall be construed broadly to effectuate its purpose. . . ." [Citations omitted.].

The following terms are defined in 22–9–1–3:

"(1) The term 'discriminatory practice' shall mean the exclusion of a person, from equal opportunities because of race, religion, color, sex, national origin or ancestry; or a system which excludes persons from equal opportunities because of race, religion, color, sex, national origin or ancestry; or the promotion of racial segregation or separation in any manner, including but not limited to, the inducing of, or the attempting to induce, for profit, any person to sell or rent any dwelling by representations regarding the entry or prospective entry in the neighborhood of a person or persons of a particular race, religion, color, sex, national origin or ancestry. Every discriminatory practice relating to the acquisition or sale of real estate, education, public accommodations or unemployment shall be considered unlawful unless it is specifically exempted by IC 1971, 22–9–1 . . . ." [Citations omitted.].

\*　　\*　　\*　　\*　　\*　　\*

"(p) The term 'sex' as it applies to segregation or separation in this chapter . . . shall apply to all types of employment, education, public accommodations, and housing: Provided, however, That (1) it shall not be discriminatory practice to maintain separate rest rooms; and That (2) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any other individual in any such program on the basis of sex in those certain instances where sex is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise;

and That (3) it shall not be a discriminatory practice for a private or religious educational institution to continue to maintain and enforce a policy of admitting students of one sex only. . . ." [Citations omitted.].

This is a case of first impression in Indiana. In its brief to this Court, the ICRC stresses that 22–9–1–6 empowers it to formulate policies to effectuate the Law and, further, that the legislative intent that the Law should be construed broadly is manifest in 22–9–1–2(e). Additionally, the ICRC has provided us with copies of two decisions, not appealed above the administrative level, to demonstrate that its decision in this case was consistent with prior ICRC policy determinations.

■ The interpretation of a statute by an administrative agency is entitled to great weight, although it is not binding upon this Court when that interpretation is incorrect or if the legislative will is obvious. *Indiana State Fair Board v. The Hockey Corporation of America* (1975), Ind.App., 333 N.E.2d 104. There is a presumption of legislative acquiescence in an agency's interpretation when no change is made in the statute. *Bender v. State* (1979), Ind.App., 388 N.E.2d 578.

■ The cardinal rule in construing a statute is to ascertain and effectuate the legislative intent. *Abrams v. Legbandt* (1974), 160 Ind.App. 379, 312 N.E.2d 113. Where the statutory language is the same or similar, federal decisions may be very

persuasive as authority and we will give careful consideration to such decisions even though they are not binding on us. *Graves Trucking, Inc. v. B. G. Trucking, Inc.* (1972), 151 Ind.App. 563, 280 N.E.2d 834; *Lutz v. Goldblatt Brothers, Inc.* (1967), 140 Ind.App. 678, 225 N.E.2d 843.

Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C.A. § 2000e–2(a) [5], has been construed by many federal courts in the context of grooming standards imposed by private employers. Although we have found an exiguous amount of dispositional federal cases [6], we look to these decisions for guidance as to analytic approach and construction of legislative intent.

The federal courts have based their determinations on a three-level analysis: (1) Has there been some form of discrimination in that similarly situated individuals have received different treatment?; (2) If so, was the discrimination one which the legislative body intended to forbid as sex discrimination?; and (3) If so, may the practice be justified by the employer as a legally permissible bona fide occupational qualification? *Willingham v. Macon Telegraph Publishing Company* (5th Cir.1975), 507 F.2d 1084. *See Earwood v. Continental Southeastern Lines, Inc.* (4th Cir.1976), 539 F.2d 1349; *Knott v. Missouri Pacific Railroad Company* (8th Cir.1975), 527 F.2d 1249; *Dodge v. Giant Food, Inc.* (D.C.Cir.1973), 160 U.S.App.D.C. 9, 488 F.2d 1333.

■ Applying the first level of inquiry to the factual situation in this case, we

5. 42 U.S.C.A. § 2000e–2 provides:
   Unlawful employment practices—Employer practices
   "(a) It shall be an unlawful employment practice for an employer—
   "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
   "(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an

employee, because of such individual's race, color, religion, sex, or national origin."

6. The Court in *Brown v. D.C. Transit Sys., Inc.* (D.C.Cir.1975), 173 U.S.App.D.C. 130, 523 F.2d 725, *cert. denied* 423 U.S. 862, 96 S.Ct. 121, 46 L.Ed.2d 91, held that the requirement of "hirsute conformity" by a private employer did not violate constitutional rights claimed by black male employees. In *Rafford v. Randle E. Ambulance Serv., Inc.* (S.D.Fla.1972), 348 F.Supp. 316, the Court found that dismissal of male employees for refusal to remove beards and moustaches did not violate Title VII in that discrimination between different categories of the same sex did not qualify as sex discrimination.

must determine whether similarly situated individuals at Sutherland received different treatment. Similarly situated individuals of one sex cannot be discriminated against vis-a-vis members of their own sex unless the same distinction is made among those of the opposite sex. *Knott v. Missouri Pacific Railroad Company, Inc., supra.* "Sex-plus" discrimination occurs when employees are classified on the basis of sex *plus* one other seemingly neutral characteristic.[7] *Willingham v. Macon Telegraph Publishing Company, supra.* The ICRC argues that Sutherland engaged in a form of "sex-plus" discrimination which treated men and women differently as the result of a sexual stereotype[8], i. e., the presence of facial hair.

The ability to grow facial fair in the form of beards and moustaches is usually a characteristic special to males. Sutherland's male employees with moustaches were treated differently then male employees who were clean shaven. Therefore, Sutherland's grooming policy discriminated between similarly situated males without likewise affecting females. We must answer affirmatively to the query of the first level.

The second level of inquiry is whether this discrimination is a type which the Legislature intended to proscribe. The federal courts have sought guidance from the legislative history of Title VII. They have determined that the purpose of Title VII is to provide equal employment opportunity which may not be thwarted by employers who discriminate on the basis of an immutable characteristic or in violation of a fundamental right. As stated by the Court in *Willingham v. Macon Telegraph Publishing Company, supra*:

"We perceive the intent of Congress to have been the guarantee of equal job opportunity for males and females. Providing such opportunity is where the emphasis rightly lies. This is to say that the Act should reach any device or policy of an employer which serves to deny acquisition and retention of a job or promotion in a job to an individual *because* the individual is either male or female. The language of the Supreme Court in *Griggs* regarding racial discrimination applies with equal (but not greater) force to sexual discrimination: 'The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.' *Griggs v. Duke Power Co.*, supra, 401 U.S. [424] at 429–430, 91 S.Ct. [849] at 853, 28 L.Ed.2d [158] at 163."

507 F.2d at 1091.

Immutable characteristics include factors such as race, national origin, and color. Changeable characteristics which involve fundamental rights, such as religion, procreation, or marriage, are also protected. *See Baker v. California Land Title Company* (9th Cir.1974), 507 F.2d 895.

An individual citizen has a constitutional right to wear beards, sideburns, or moustaches. However, it is not a fundamental right protected by the federal government. *Brown v. D.C. Transit System, Inc.* (D.C.Cir.1975), 173 U.S.App.D.C. 130, 523 F.2d 725, *cert. denied*, 423 U.S. 862, 96 S.Ct. 121, 46 L.Ed.2d 91. *Marshall v. District of Columbia* (D.D.C.1975), 392 F.Supp. 1012.

7. The concept of "sex-plus" discrimination is illustrated by the case of *Phillips v. Martin Marietta Corp.* (1971), 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613. The employer in *Phillips* refused to accept job applications from women with pre-school children, but had no such policy with respect to male applicants. The Court held that the hiring policy defeated the legislative purpose of affording persons of like qualifications equal employment opportunity irrespective of sex.

8. In support of its position, the ICRC cites *Sprogis v. United Air Lines, Inc.* (7th Cir.1971), 444 F.2d 1194, *cert. denied* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543. The *Sprogis* court found a no-marriage policy for female stewardesses to be discriminatory because there was no such prohibition for male stewards or other employees.

The ICRC's position is that the ability to grow a beard is an immutable characteristic of males which requires several months to fully develop. The ICRC urges us to view Sutherland's grooming policy as a subtle discriminatory method designed to deny equal employment opportunity in that it perpetuates a sexual stereotype.

While we acknowledge the inherent ability of males to grow beards and moustaches, we also recognize that the growth and maintenance of facial hair is not an absolute quality. It can be changed through shaving, if the individual so desires, for cosmetic effect. "Since race, national origin and color represent immutable characteristics, logic dictates that sex is used in the same sense rather than to indicate personal modes of dress or cosmetic effects. . . ." *Baker v. California Land Title Company,* 507 F.2d at 897.

■ The right of an employer to promulgate grooming regulations to project a certain image is recognized as an aspect of managerial responsibility necessary in a competitive business environment. *Fagan v. National Cash Register Company* (D.C. Cir.1973), 157 U.S.App.D.C. 15, 481 F.2d 1115. Employees may accept or reject the grooming policy; an employer is not required to account for the personal preferences of employees in respect to grooming standards. *See La Von Lanigan v. Bartlett and Company Grain* (W.D.Mo.1979), 466 F.Supp. 1388.

In *Dodge v. Giant Food, Inc.* (D.C.Cir. 1973), 160 U.S.App.D.C. 9, 488 F.2d 1333, the Court upheld a company's right to regulate hair length although males were obviously treated differently then females. The regulation was viewed as not denying equal employment opportunities and the rationale was explained as follows:

"Some courts have analogized hair-length regulations to the requirement that men and women use separate toilet facilities or that men not wear dresses.

Admittedly these are extreme examples, but they are important here because they are logically indistinguishable from hair-length regulations. These examples, like hair-length regulations, are classifications by sex which do not limit employment opportunities by making distinctions based on immutable personal characteristics, which do not represent any attempt by the employer to prevent the employment of a particular sex, and which do not pose distinct employment disadvantages for one sex. Neither sex is elevated by these regulations to an appreciably higher occupational level than the other. We conclude that Title VII never was intended to encompass sexual classifications having only an insignificant effect on employment opportunities." (Footnotes omitted.).

160 U.S.App.D.C. at 12–13, 488 F.2d at 1336–1337. In *Dodge* it was also emphasized that the company enforced strict grooming regulations against both male and female employees which reduced the disparity of treatment between the sexes.

Other cases holding that grooming standards which apply differently between the sexes do not violate the broad prohibitions against sex discrimination under Title VII include: *Fountain v. Safeway Stores, Inc.* (9th Cir.1977), 555 F.2d 753; *Barker v. Taft Broadcasting Company* (6th Cir.1977), 549 F.2d 400; *Earwood v. Continental Southeastern Lines, Inc., supra; Longo v. Carlisle DeCoppet & Co.* (2d Cir.1976), 537 F.2d 685; *Knott v. Missouri Pacific Railroad Company, supra; Brown v. D.C. Transit System, Inc., supra; Willingham v. Macon Telegraph Publishing Company, supra; Baker v. California Land Title Company, supra; Fagan v. National Cash Register Company, supra; Carroll v. Talman Federal Savings and Loan Association of Chicago* (N.D.Ill. 1978), 448 F.Supp. 79; *Hearth v. Metropolitan Transit Commission* (D.Minn.1977), 436 F.Supp. 685; *Miller v. Missouri Pacific Railway* (W.D.Miss.1976), 410 F.Supp. 533.[9] In

---

9. Courts in other state jurisdictions have interpreted their individual statutes in a similar manner. *See Pik-Kwik Stores, Inc. v. Commis-* *sion on Human Rights and Opportunities* (1976), 170 Conn. 327, 365 A.2d 1210; *Southern Pacific Transp. Co. v. Doyal* (La.App.1974),

a Title VII action, an employer is not obligated to justify its grooming policy until a prima facie case of discrimination has been proven. *La Von Lanigan v. Bartlett and Company Grain* (W.D.Mo.1979), 466 F.Supp. 1388.

Thus, many Federal Courts have declined to ascribe sweeping implications to the language of Title VII in its applicability to private employers without a stronger Congressional mandate. *Willingham v. Macon Telegraph Publishing Company, supra.*

 In construing legislation, this Court must employ a reasonable interpretation of statutory language as a means of discovering the Legislature's true goals. *Pryor v. State* (1973), 260 Ind. 408, 296 N.E.2d 125. Turning to the intent of the Indiana Legislature, we note the stress placed on ensuring that equal employment opportunity be available. 22–9–1–2. While the Legislature authorized a broad construction of the Law, it also emphasized a policy of protecting employers from unfounded charges of discrimination. 22–9–1–2(c).

In a case such as this, in which no state action is involved in the sex discrimination and no fundamental constitutional right is infringed upon, we will not apply the force of the Indiana Civil Rights Law without a clear legislative mandate. We reject the ICRC's theory that a private employer's grooming policy which forbids moustaches is discriminatory to the extent that it denies equal employment opportunity.

Our answer at the second analytic level is negative. We need proceed no further in considering whether a bona fide occupational qualification exists [see 22–9–1–3(q)] in the third level of the analytic approach.

The ICRC also contends that its action was not arbitrary and capricious. Arbitrary and capricious action by an administrative agency is action taken, in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same

conclusion. *See Gary Transit, Inc. v. Public Service Commission of Indiana* (1974), 161 Ind.App. 7, 314 N.E.2d 88; *State Board of Tax Commissioners v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.* (1951), 121 Ind.App. 302, 96 N.E.2d 279.

We have a duty to accept the ultimate facts stated by the trial court if there is evidence to sustain them and they are not contrary to law. *State Board of Tax Commissioners v. Wright* (1966), 139 Ind.App. 370, 215 N.E.2d 57.

The record reveals that Sutherland's grooming policy was enacted for business purposes and was uniformly enforced against both male and female employees. Additionally, Gerardot and Burton could have remained with Sutherland if they had chosen to comply with the policy. For the reasons addressed above, the trial court's determinations are not contrary to law.

The judgment of the trial court is affirmed.

GARRARD, P. J., and HOFFMAN, J., concur.

289 So.2d 882; *Planchet v. New Hampshire Hosp.* (1975), 115 N.H. 361, 341 A.2d 267; *Albertson's Inc. v. Washington Human Rights Comm'n.* (Wash.App.1976), 11 Emply.Prac.

Dec. ¶ 10,682; *Greyhound Lines-West, Inc. v. Department of Indus., Labor and Human Relations* (Wis. Cir. 1975), 9 Empl.Prac.Dec. ¶ 10,017.